JAY RORTY, S.B.N. 135097
LAW OFFICES OF JAY RORTY
501 Mission Street, Ste. 10
Santa Cruz, CA 95060
Telephone: (831) 427-8154
Email: jayrorty@gmail.com

*Attorney for Defendant Mark DeHart*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARK DEHART,<br><br>Defendant. | Case No. 5:22-cr-00146-EJD<br><br>**DEFENDANT MARK DEHART's SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE UNDER 18 U.S.C. § 3553(a)**<br><br>Court: Courtroom 4, 5th Floor<br><br>Hearing Date: September 30, 2024<br><br>Hearing Time: 1:30 p.m. |

...

**Table of Contents**

I. INTRODUCTION ........................................................................................................... 3
II. BACKGROUND ............................................................................................................. 4
    A. Personal Background – History and Characteristics ............................................... 4
    B. Nature and Circumstances of the Offense ............................................................. 6
    C. Conduct on Pretrial Release .................................................................................. 7
    D. Future Plans and Goals ........................................................................................ 11
III. THE LEGAL STANDARD ........................................................................................... 12
IV. PLEA AGREEMENT AND GUIDELINES RANGE ................................................... 13
    A. Mr. DeHart's Plea Agreement ............................................................................. 13
    B. The Court Must Not Presume that the Guidelines Sentencing Range is Reasonable. ........................................................................................................... 14
    C. The Court Must Apply the 3553(a) Factors to Impose the Shortest Sentence Possible that Satisfies the Purposes of Sentencing. ............................................. 14
    D. A Sentence of Supervised Probation is Considered a Substantial Punishment. ............................................................................**Error! Bookmark not defined.**
V. THE SECTION 3553(A) FACTORS STRONGLY FAVOR A DOWNWARD VARIANCE ..................................................................................................................... 15
    A. Mr. DeHart's Decision-Making Was Impaired at the Time of His Offenses ....... 16
    B. Specific Deterrence ............................................................................................... 17
    C. Seriousness of the Offense, Respect for the Law and Just Punishment ................ 17
VI. CONCLUSION .............................................................................................................. 18

# Table of Authorities

**Cases**

*Gall v. United States*, 128 S. Ct. 586 (2007).................................................................................. 10

*Kimbrough v. United States*, 552 U.S. 85, 101 (1997) ..................................................................... 8

*Koon v. United States*, 518 U.S. 81, 113 (1996 ................................................................................ 8

*United States v. Ameline,* 409 F.3d 1073, 1093 (9th Cir. 2005) ....................................................... 8

*United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) ........................................................ 9

*United States v. Cantu*, 12 F.3d 1506, 152, 1516 (9th Cir. 1993 ..................................................... 11

*United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008 ................................................................ 8

*United States v. Jimenez-Beltre*, 440 F.3d 514, 525 & n.8 (1st Cir. 2006).................................... 10

*United States v. Lewinson*, 988 F.2d 1005 (9th Cir. 1993).............................................................. 11

*United States v. Mohamed*, 459 F.3d 979, 987 (9th Cir. 2006) ........................................................ 8

*United States v. Ruff,* 535 F.3d 999, 1001, 1003 (9th Cir. 2008)...................................................... 8

*United States v. Vasquez*, 160 F.3d 1237, 1238 (9th Cir. 1998)...................................................... 14

*United States v. Vonner*, 516 F.3d 382, 392 (6th Cir. 2008) ............................................................ 8

*United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) ....................................................... 8

**Statutes**

18 U.S.C. § 3553(a)(2)............................................................................................................. 10, 13

USSG § 5K2.13 ............................................................................................................................. 11

**I.   INTRODUCTION**

The Court is scheduled to sentence Mark DeHart on September 30, 2024. On December 6, 2022, Mr. DeHart pled guilty to Counts One and Two of the Superseding Information, which includes felon in possession of ammunition and possession of an unregistered short-barreled rifle. The charges arose out of a parole compliance check that occurred on June 29, 2021.

Mr. DeHart has taken full responsibility for his actions. He feels remorse about this behavior and the years of his life he wasted making bad decisions and hurting others. He readily acknowledges that he engaged in the unlawful conduct as a result of his drug addiction together with struggling to reintegrate himself following his prior incarceration. Mr. DeHart has since completely changed the entire direction of his life so that he can focus entirely on sobriety, living a law-abiding life and helping others do the same.

The Pre-Sentence Report (hereafter PSR) recommends a substantial variance to a sentence of one year and one day – which because of time already served and good time credits would result in Mr. DeHart serving 27 days in federal prison. PSR ¶¶ 5-7. (He has already served 284 days against the proposed term of 311 days which is 85% of a year and day.) While the defense recognizes the severity of the offenses, the recommended sentence is greater than necessary to achieve the purposes of sentencing as defined in 18 U.S.C. 3553 (a)-(f).

Mr. DeHart does not require additional custodial sentence to deter him from future crime or induce him to make necessary changes in his life because he is already making them. Incarcerating Mr. DeHart at a time when he is not only fully rehabilitated and far removed from any serious criminal conduct would be counter to both public policy and to Mr. DeHart's personal progress towards a productive and law-abiding life. His life over the last two years has not merely avoided criminal activity, he has done the hard work to turn his life around while dedicating himself to being a positive force in the lives of others. In fact, as discussed below and in the PSR, Mr. DeHart has met or exceeded the goals and requirements of this Court's Conviction Alternatives Program (CAP).

If the Court were to adopt either the prosecution or Probation's recommendation, he would be set back years from his commitment to rehabilitation. Moreover, he has steady

3

employment, stable housing, a supportive and effective therapy and counselling network, and educational opportunities, all of which would be threatened by returning to prison. In effect the message to him would be that his efforts were in vain. By contrast, the defense recommendation supports public safety in that allows him to continue his progress and avoid the inevitable setbacks of reentry after prison.

Mr. DeHart now asks this Court to sentence him to time served (284 days), and two years supervised release. Such a sentence is justified by the circumstances of Mr. DeHart's life, his remarkable efforts in his recovery, law-abiding conduct in the last several years, and by the acknowledgement that the interests of justice would not be served by his incarceration.

## II.  BACKGROUND

### A.  Personal Background – History and Characteristics

Mr. DeHart was born and largely raised in the Bay Area. As a child, he suffered significant emotional and physical abuse. His father was a heavy drinker who also used cocaine and marijuana in Mr. DeHart's presence. Mr. DeHart was beaten by his father with his hands, his belt and on at least on occasion with a flashlight. PSR ¶50. Mr. DeHart's mother was also a heavy drinker. She, too, when drunk would physically abuse Mr. Dehart. *Id.*

Mr. DeHart's parents' substance abuse issues also led to a lack of care and oversight of Mr. DeHart's needs and, just as importantly, a lack of protection from the outside world. Between the ages of four and six, Mr. DeHart was sexually molested by two teenage neighbors. PSR ¶51. At around the same time, Mr. DeHart's father was regularly have sex with one of the teen neighbors that was abusing Mr. DeHart. *Id.* This cycle of violence and abuse continued for some time. Not surprisingly, either because of embarrassment or fear, Mr. DeHart never told his parents about the molestations. *Id.*

Mr. Dehart's parents divorced when he was six. PSR ¶52. The relationship was very dysfunctional and had a negative impact on him. Initially, he stayed with his mother. *Id.* When he began having difficulties in school, he was sent to live with his father in Hermosa Beach. *Id.* His father continued to be abusive toward him during that period. *Id.*

4

At age ten, Mr. DeHart returned to live with his mother in San Jose. PSR ¶ 53. She continued to struggle with alcoholism, and he continued to struggle to control his emotions and behavior. *Id.* He was placed in an inpatient adolescent program in San Jose. At 13, he was sent to a juvenile mental health and substance abuse inpatient program. At 14, at the urging of Mr. DeHart's then stepfather, Mr. DeHart's mother kicked him out of the house. *Id.* For the next two years, he slept wherever he could find a place, including friends' couches. *Id.*

At 16, Mr. DeHart was "kidnapped" by his father, who dropped him off in Utah at Sorenson's Ranch School, a "wilderness school" for troubled youth for the next six months. PSR ¶ 54. While there, Mr. DeHart was beaten by school employees. *Id.* Other children were physically and sexually abused by the staff. *Id.* At the conclusion of the program, he was sent to live back to Hermosa Beach to live with his abusive father. *Id.*

Sometime in his 17th year, he moved back to the Bay Area to live with his mother who had finally achieved sobriety. PSR ¶ 55. When he turned 18, Mr. DeHart moved out to live with his then girlfriend. *Id.* They married two years later and, in 2003, had a child together, Michael DeHart. PSR ¶ 56. Their marriage was tumultuous due to Mr. DeHart's substance use and his wife's physical and verbal abuse of him. Still, they stayed together. Mr. DeHart enjoyed being a father and was able to earn a living sufficient support the family. *Id.*

All of that changed in 2008 or 2009 when Mr. DeHart had a serious motorcycle accident. PSR ¶60. He had internal bleeding and required surgeries on his right knee, left shoulder, right wrist, spine area, right bicep, and left ankle. *Id.* Most devastating of all, he suffered a traumatic brain injury (TBI) when his helmeted head hit the curb. *Id.*

Ultimately, the severity of his injuries and the difficulties attendant to his recovery led to the end of his marriage, in part because Mr. DeHart could no longer maintain continuous lucrative employment. PSR ¶ 57. The couple separated within a year after the accident. *Id.* The accident also had the disastrous side effect of leading Mark to become addicted to pain medication. PSR ¶ 60. He began to seek mental health treatment for the varied mental and physical issues flowing from the accident. *Id.* During this treatment he was overprescribed prescribed benzodiazepines, nominally to fight his anxiety. He withdrew from his family and son

5

due to the personality changes the drugs created. The relationship he was in also suffered dramatically. His demeanor and personality grew negative and abrasive. He suffered his first arrest, for domestic violence. At that time, he relapsed to alcohol and methamphetamine use. This was the background that led up to the offenses before the court. PSR ¶ 64.

### B. Nature and Circumstances of the Offense

Mr. DeHart has pled guilty to possession of a substantial number of firearms and firearms related devices. PSR ¶¶ 2, 3 & 15. Although no narcotics offenses were alleged, narcotics and paraphernalia were recovered from Mr. DeHart's vehicle and home. PSR ¶¶ 14,15. Further, Mr. DeHart reported to the Probation Office that he used of methamphetamine daily (snorting and smoking) between approximately ages 42 and 45. PSR ¶ 64. In sum, at the time of his arrest he was in the throes of addiction to methamphetamine and obsessive behavior driven by that addiction. PSR ¶ 14. As is well recognized, a side effect of methamphetamine addiction is paranoia. This paranoia led to the amassing of weapons.

The reasons for his addiction are complicated and multifactorial. The physical, emotional and sexual abuse he suffered as a child, certainly played a role. He also needed to cope with the pain of his parents' divorce, being shunted from one alcoholic parent's house to the other and feelings of rejection when his mother and stepfather forced him to seek shelter on friends' couches and fending for himself at the age of 14. Later, as a young adult, he was in a brutal motorcycle accident requiring multiple operations and leaving him with a TBI and addiction to pain medications at the hands of a medical system that turned a blind eye to the risk of opioids.

The other issue at play for Mr. DeHart was a lack of support network and difficulty reintegrating into society following his three-year sentence from a 2016 conviction. As he noted to the Probation Office, "When I was released from incarceration in 2019, I had no significant support. My friends from before stayed away from me, and I had no family in the area. Most of the people that wanted to associate with me were in the criminal lifestyle. ... I can recognize this now after years of ongoing therapy and treatment and understand that this was an inappropriate way of dealing with my environment."

Over the course of the three plus years that have passed since his arrest, Mr. DeHart has grown and matured in numerous ways. As discussed below, he has invested enormous amounts of time and energy to understand himself, identify the reasons for his addiction and get the help he needed (and continues to need) to get his life on track. Just as importantly, as part of this processes of growth and development, Mr. DeHart has come to understand and take full responsibility for his conduct.

In communicating with the Probation Office, about his culpability for the offenses, he responded:

> Yes. My untreated substance abuse coupled with my mental and physical health problems as well as an unsafe environment and a feeling that society had abandoned me led to me owning weapons and ammunition that I was prohibited to possess.

PSR ¶ 21

He went on to elaborate:

> I feel remorse for the impact that this has had on myself and others. After much therapy and treatment, I can recognize that my emotional and physical health, inability to recognize unsafe environments, and my feelings that no one would ever help me lead to me behave in ways that were antisocial. [My behavior] has harmed my family primarily. My untreated issues have caused them a great deal of stress and worry. It has also harmed those who relied on me as well as society. It has made people spend a lot of time and effort prosecuting and defending me as well as people making me get my life back on track.

*Id.*

These are the words of a person who fully appreciates and understands what led him to engage in unlawful conduct and what he needs to do to ensure it never happens again.

### C. Conduct on Pretrial Release

Mr. Dehart's conduct and performance over the last two-plus years has been, in a word, exemplary. It took him a little while to get there and he had some missteps early on in his post-

7

arrest, pre-sentencing journey. Once he found his way, though, he has been resolute in his determination to address his underlying issues and turn his life around. In doing so, he has met, and in many respects, exceeded the standards of this Court's Confinement Alternatives Program.[1]

Mr. DeHart was released to Center Point on July 5, 2022. He successfully completed all aspects of this intensive residential treatment program and graduated in September 2022. He had no positive drug tests and no disciplinary history during his tenure at that program. PSR ¶8.

Mr. DeHart remained committed to treatment and to continuing his rehabilitative progress, so although not required to do so, he enrolled himself in further treatment. He entered another residential treatment center, residing at and receiving counseling at Marin Services for Men. This rigorous program required ninety meetings in ninety days and five meetings a week for another 90 days as well as completion of 12 steps of AA. Mr. DeHart completed this supplemental program in March 2023, again with no positive drug tests and no rule violations. Mr. DeHart was so well respected within the program that he was encouraged to become a peer counselor, helping numerous other residents on their path to recovery. While at the program he had house management responsibilities, including intake packets, resident orientation, collecting rent, and administering drug tests. [See Exhibit A for a copy of his certificate of completion from Marin Services for Men.]

---

[1] As indicated in the PSR, during the period following his initial success at CenterPoint Mr. DeHart vociferously advocated that undersigned counsel apply for CAP. Undersigned counsel believed that it was necessary for Mr. DeHart to demonstrate a greater degree of rehabilitation before applying for CAP. Nevertheless, at the suggestion of Pretrial Service Officer Tim Elder, counsel requested an evaluation for CAP. Following an evaluation, Pretrial recommend against CAP, stating:

"Given that the defendant has successfully completed both residential treatment and an intensive outpatient program and has maintained his sobriety for two years, Pretrial Services is not recommending him for the Convictions Alternative Program (CAP) at this time. However, he may be an appropriate candidate for another alternative court program."

Undersigned Counsel is naturally concerned that Counsel's decision not to seek CAP earlier than he did deprived Mr. Dehart of a substantial benefit. While this is clearly a tactical decision within counsel's authority, counsel urges the Court to consider the above procedural history as it evaluates the extent and nature of the variance in this case. As argued throughout this memorandum, Mr. Dehart's commitment to his recovery, his education, continuing employment and, commitment to help others struggling with addiction, all demonstrate that a custodial sentence would not further the statutory purposes of sentencing.

Mr. DeHart still sought to better himself, ensure his continued sobriety and assist others, so simultaneously with his work at Marin Services for Men, he sought counseling with the Ritter Center intensive outpatient program, another San Rafael organization providing counseling services. He has been in continuous therapy, independent of his substance abuse treatment since his release from custody, engaging in personal growth and the development of insight into his past and strategies for change. He graduated from the Ritter Center's six-month program on November 10, 2023, and continues to meet with his counselor from that program. PSR ¶ 9.

His progress has been recognized by the person, other than Mr. DeHart himself, that knows him best, his mother. She will be attending the Sentencing Hearing on September 30th. She also provided the Court with a letter sharing some of her observations on who Mr. DeHart has become. "The silver lining in these recent legal issues for Mark is that he has been properly diagnosed, and is being treated for his mental issues, committed himself to his sobriety which has, in return allowed him amazing growth. He has become productive for himself and others." She went on to say, "One of my most precious memories of my 33 plus years of sobriety, was passing on my 3 year sobriety medallion to Mark this past December. It was such a joy! To see Mark happy and useful again was the answer to my many prayers." [Letter from Lynne DeHart-Duston attached as Exhibit B]

Mr. DeHart's stepfather, Daniel Duston,[2] who works in the field of alcohol and drug recover, has also noticed the positive changes in Mr. DeHart and what it portends for a stable, sober future. "I have known Mark for 28 years, and I can honestly say this is the healthiest I have seen him, not only physically, but spiritually and mentally healthy as well. … Based on my years of working with the mentally ill and people with addiction problems, Mark's current situation in the community, and efforts in putting his life in order should be a good indication as to what his tomorrows will entail." [Letter from Daniel Duston attached as Exhibit C]

Mr. DeHart knew that in order to ensure his continued success he would have to supplement his recovery and personal development with practical tools that would earn him a

---

[2] Note: Mr. DeHart's mother remarried twice after leaving Mr. DeHart's father. His current stepfather has been a supportive and positive presence in Mr. DeHart's life and should not be confused with the person mentioned earlier in this memo.

9

living. So, again, simultaneously with all of his counseling commitments, he enrolled in the College of Marin. Since his enrollment he has amassed 49 credits towards an AA degree. He is an honor roll student on track to graduate this fall with a degree in Advanced Manufacturing Sciences with a 3.62 GPA. He's also close to earning an additional concentration in Behavioral Sciences. [Attached as Exhibit D is a copy of Mr. DeHart's current unofficial transcript showing the classes he has completed, his GPA and the classes he is currently enrolled in with the school.]

In addition, Mr. DeHart is committed to sharing his experiences and lessons learned to help others. In December of 2023, Mr. DeHart earned a certification from the California Consortium of Addiction Programs and Professional to allow him to serve as a drug and alcohol counselor. [Attached as Exhibit E is a copy of Mr. DeHart's certificate from the CCAPP and a screenshot from CCAPP's website confirming his status.] Mr. DeHart has used these skills and his belief in serving others to secure a position as an ambassador between his school (College of Marin) and University of California Berkeley's programs for formerly incarcerated and system impacted students – entitled Berkeley Underground Scholars. [Attached as Exhibit F is a letter of support from Danny Murillo, Associate Director and Co-Founder of Berkeley Underground Scholars (BUS) at the University of California, Berkeley.]

In his letter in support of Mr. DeHart, Director Murillo noted the following about Mr. DeHart:

> Mr. DeHart has enthusiastically embraced his leadership role as an Ambassador at the College of Marin. He volunteers with incarcerated youth in Marin County and serves as a facilitator for Alcoholics Anonymous meetings through Hospitals & Institutions. [He] has a strong support network composed of individuals who are invested in his success. … Mr. DeHart is a person of great potential and thrives in an environment that challenges and cultivates his best qualities.

In addition to counselling and therapy to understand the reasons for a person's addiction, the triggers that cause times of weakness, and how to manage those difficult times, essential elements for sustained success are stable housing – which can be incredibly challenging in the

Bay Area – and steady employment. "[T]here is a high correlation between housing insecurity (or the state of not having stable or adequate living arrangements) and substance use disorders." Sahvanah Prescott, *How stable housing supports recovery from Substance Use Disorders Opioid Principles* (Johns Hopkins School of Public Policy, 2024).[3] As with Mr. DeHart's educational and psycho-social progress, he has been thoughtful and determined to ensure that these critical keys to success were and are secured.

Following his completion of treatment at Center Point, Mr. DeHart was able to secure a spot in a Sober Living Environment in San Rafael. PSR ¶ 10. This housing arrangement works incredibly well for Mr. DeHart. He feels supported by and connected to the other residents of this home. It is not an exaggeration to say that this has been a critical aspect of Mr. DeHart's continued recovery. Were Mr. DeHart to be sent to prison, this essential stabilizing part of his life may very well be lost.

Mr. DeHart has also obtained a Handyman's Business License and opened his own business doing repairs. PSR ¶ 69. Mr. DeHart reports to the undersigned that his clients love him and the work he performs. The result is that his hard work has allowed him to earn enough money to support himself.

The positive decisions Mr. DeHart has made in his life in the last two-plus years have been life-changing. He is no longer masking his pain with drugs, fearful of others, or, most notably, feeling lost and unsupported. He is living a life that is honest and open, and focused on his health, pursing his passion of making thing with his hands, and giving back to others.

### D. Future Plans and Goals

Mr. DeHart has worked hard to improve his life and his health while in recovery for the last two plus years. His whole life has been centered around sobriety, and his main priority is to continue on that journey. If he is permitted to remain in the community, Mr. DeHart intends to continue with his therapy and counselling sessions that have served him so well. Mr. DeHart understand that these are lifetime obligations.

---

[3] https://opioidprinciples.jhsph.edu/how-stable-housing-supports-recovery-from-substance-use-disorders/ (last visited Sep 20, 2024)

Closely tied to this goal is remaining in his current Sober Living Environment. This home has been and continues to be foundational to Mr. DeHart. It provides him with spiritual, personal and social shelter from the many storms life throws his way.

Mr. DeHart also has a significant professional opportunity. At the conclusion of this academic term, Mr. DeHart will earn his associates degree from College of Marin. Mr. DeHart, if he remains out of custody, has been offered a machinist position with OMW Corp, a sophisticated manufacturer located in Novato that specializes in medical and aeronautical parts. Mr. DeHart is excited about this role and sees it has a springboard to a career as a machinist. In fact, Mr. DeHart hopes that he may one day have his own business in this industry.

## III.   THE LEGAL STANDARD

This Court's fundamental task is to impose consequences that will achieve a just sentence in light of the facts and circumstances of this particular case and this particular offender. The "overarching statutory charge" under 18 U.S.C. § 3553 is for the court to "impose a sentence sufficient, but not greater than necessary" to accomplish the statutory objectives of federal sentencing. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (quoting 18 U.S.C. § 3553(a)); *see also Kimbrough v. United States*, 552 U.S. 85, 101 (1997). And in doing so, the Supreme Court has directed sentencing judges to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996).

The advisory Guidelines range is merely the "starting point and the initial benchmark" in this process. *Gall*, 552 U.S. at 49; *Carty*, 520 F.3d at 991. The Supreme Court's decision in *Gall* and its progeny have "breathed life into the authority of district court judges to engage in individualized sentencing" *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) quoting *United States v. Vonner*, 516 F.3d 382, 392 (6th Cir. 2008) (*en banc*), and confirmed the power of district courts to depart from the Guidelines in appropriate cases. *See United States v. Mohamed*, 459 F.3d 979, 987 (9th Cir. 2006) ("any deviation from the applicable advisory guidelines range [is] viewed as an exercise of the district court's post-*Booker* discretion and

reviewed only for reasonableness.").

To meet its mandate of imposing a sentence that is "sufficient, but not greater than necessary" the court is directed to consider all of the factors listed in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense, the history and characteristics of the defendant, the kind of sentences available, and the need for the sentence imposed to reflect the seriousness of the offense and afford adequate deterrence. *See* 18 U.S.C. §3553(a).

In undertaking this analysis, this Court should weigh heavily in the balance the factors that are unique to Mr. DeHart – his history of substance abuse and mental health issues, strong family and community support, and ongoing commitment to his recovery and mental health treatment as well as giving back to others – since these circumstances are highly relevant to assessing what sort of punishment is reasonable, sufficient, and not greater than necessary. *See, e.g., United States v. Ruff,* 535 F.3d 999, 1001, 1003 (9th Cir. 2008) (history of strong employment, family support), *United States v. Ameline,* 409 F.3d 1073, 1093 (9th Cir. 2005) (Wardlaw, J. concurring and dissenting) ("defendant's family ties and responsibilities, his or her educational and vocational skills, and his or her military, civic, charitable, or public service record" and other factors are "essential to sentencing consistent with 18 U.S.C. § 3553(a)"); *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (public service and good works, commitment to helping persons in distress).

### IV. PLEA AGREEMENT AND GUIDELINES RANGE

#### A. Mr. DeHart's Plea Agreement

Mr. DeHart entered into a Plea Agreement under Federal Rule of Criminal Procedure 11(c)(1)(B). Dkt. 71. Under the terms of that agreement, Mr. DeHart is not limited in what sentence he can ask the Court to impose. *Id.* at p. 7. Both the Plea Agreement and Presentence Report accurately report that the Base Offense Level for this Offense is 22, with 2-point upward adjustment for possessing three to seven firearms, a 4-point upward adjustment for possession of firearms in connection with another felony, and 3-point deduction for acceptance of responsibility (resulting in an adjusted offense level of 25). Under the terms of the Plea

Agreement, the Government agrees to recommend a sentence of imprisonment of no more than 71 months. (*Id.* at p. 12.)

### B. The Court Must Not Presume that the Guidelines Sentencing Range is Reasonable.

After determining the advisory sentencing range, district courts must consider the factors specifically identified in 18 U.S.C. § 3553(a) before imposing a sentence and deciding whether to depart above or below the Guidelines range, if appropriate. *See Cunningham v. California*, 549 U.S. 270, 286-87, 127 S.Ct. 856, 166 L. Ed. 2d 856 (2007). *United States v. Booker*, 543 U.S. 220 (2005) and its progeny do "not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). The Supreme Court emphasized that "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply" and that "the Guidelines are *not only not mandatory* on sentencing courts, *they are also **not** to be presumed reasonable.*" *Id.* at 352 (emphasis added). Courts must calculate the sentencing guidelines range and then determine what sentence is actually appropriate for the specific individual in light of these 18 U.S.C. §3553(a) factors. *Id.*

### C. The Court Must Apply the 3553(a) Factors to Impose the Shortest Sentence Possible that Satisfies the Purposes of Sentencing.

Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." 18 U.S.C. § 3553(a). When determining the appropriate sentence for an individual defendant, a district court should impose the shortest sentence possible that (1) reflects the seriousness of the offense, promotes respect for the law and provides just punishment for the offense; (2) deters future criminal conduct; (3) protects the public from the defendant; and (4) provides the defendant with the "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." (described as "the parsimony provision." *United States v. Jimenez-Beltre*, 440 F.3d 514, 525 & n.8 (1st Cir. 2006)). Given all of the above facts, credit for time served (284 days) in custody and two years supervised release is sufficient but not greater than necessary to achieve the purposes of sentencing.

## V. THE SECTION 3553(A) FACTORS STRONGLY FAVOR A DOWNWARD VARIANCE

The Probation Office, in justifying their recommendation for a substantial downward variance stated, as follows: "Outside of some difficulties relatively early on during the term of release, Mr. DeHart has made significant progress addressing his addiction and mental health struggles through multiple treatment programs over more than the past two years. He has continued to further his education, as well as maintained regular employment. The defendant was assessed for potential participation in the Conviction Alternatives Program (CAP), but he had already participated in a residential substance abuse treatment by that point, so was not deemed suitable for the program." PSR p. 26.

Based on this assessment, they reached the following conclusion: "Given the difficulties the defendant has experienced throughout his life, balanced against the seriousness of the offense, as well as the defendant's record of maintaining employment and his successful completion of significant substance abuse and mental health treatment, the probation officer believes a sentence below the guideline range for imprisonment is appropriate in this case and will provide sufficient punishment and deterrence, as related to 18 U.S.C. §§ 3553(a)(2)(A) and (B)." *Id.*

Mr. DeHart agrees that those factors are critical to the Court's inquiry. The PSR acknowledges all of Mr. DeHart's progress and recommends a downward variance to one year and one day. PSR p. 27. While the defense concurs with the propriety of a variance and appreciates Probation's analysis, the defense notes that Probation's recommendation does not factor Mr. Dehart's accumulated credits into the recommendation and does not consider the consequences of his credits on the ultimate sentence. Moreover, the recommendation does not sufficiently take into account the potential for negative consequences for Mr. DeHart that may result from even a short period of custody.

Mr. Dehart has 284 actual days in custody. Assuming he is given 15% credit for his pre-sentence custody that would leave 27 days to serve if the court were to adopt Probation's recommendation. The imposition of that sentence would not further the purposes of sentencing and would be extraordinarily disruptive to Mr. DeHart's education, employment, housing and

overall progress towards complete rehabilitation.

Mr. Dehart is enrolled at College of Marin for the fall 2024 term. He will graduate in December 2024, and has an employment offer from a machine shop in Novato as soon as he graduates. He resides in a sober living environment that is essential to his stability and well-being. His current counseling program is based in San Rafael. Every one of these circumstances that are vital to his progress would be irrevocably disrupted were he to be sentenced to even the proposed short term of custody. The combination of his accumulated credits and potential disruption of his progress all militates in favor of the defense recommendation of credit for time served (284 days) in custody and two years supervised release.

### A. Mr. DeHart's Decision-Making Was Impaired at the Time of His Offenses

The guidelines recognize diminished capacity as a mitigating factor and authorize a downward departure when someone commits an offense while suffering from significantly reduced mental capacity. *See, e.g.* USSG § 5K2.13, *United States v. Cantu*, 12 F.3d 1506, 152, 1516 (9th Cir. 1993) ("The goal . . . is lenity towards defendants whose ability to make reasoned decisions is impaired"); *United States v. Lewinson*, 988 F.2d 1005 (9th Cir. 1993) (four level departure based on depression). Mr. DeHart is not arguing that he is mentally incompetent, rather he asks the Court to consider the degree to which his decision-making at the time of the offense was impaired by mental health issues, including trauma, depression, and anxiety, which were not being appropriately addressed or managed, and because he was self-medicating with illegal substances for many years.

Given his history, it is not surprising that Mr. DeHart began self-medicating starting in his adolescence with alcohol and drugs to address his untreated anxiety and depression. He used drugs for nearly two decades before finally deciding to change his life and shift his entire focus to one thing: recovery. Since then, he has proven he could stay sober for years and no longer has the effects of drug addiction clouding his judgment and decision-making ability.

In sum, Mr. DeHart's judgment and decision-making processes were significantly impaired at the time of this offense by his trauma, depression, anxiety, and chronic substance abuse. This does not excuse Mr. DeHart's conduct, but rather provides necessary context in

keeping with the Court's mandate that it must consider the defendant's history and characteristics.

### B. Specific Deterrence

The central question, of course, is what punishment is sufficient, but not greater than necessary to meet the goals of sentencing. Here, Mr. DeHart's offense involved amassing guns to protect himself from perceived threats. The paranoia that fueled his belief that he needed those weapons was a direct result of his using methamphetamine.

Mr. DeHart feels great remorse about his actions and has done everything in his power to right his wrongs by setting forth on a healthy, law-abiding path in his own life in the last several years. He has put all of his efforts into quitting drugs and managing his mental health symptoms. He has the support network in place to keep him on the path he is on. Through a great deal of personal growth and maturity, he stands before this Court a different man. He has no desire to ever stand before the Court as a defendant again.

Mr. DeHart is not just asking the Court to rely on his word. He has proven in the last two-plus years his desire to live a healthy, productive life, all while giving back to others who have faced similar challenges. He has learned to live authentically and true to himself, which is in direct opposition to the secrecy he lived with for so many years that led him down a dark path of self-destruction, selfishness, and deceit. He has proven that he is capable of rising to the challenge and going beyond what is required and using the resources available to him to help himself and others.

Mr. DeHart takes great pride in his ability to redirect his life and place himself on a positive path that involves being honest, productive, and giving back to others. For the first time, he is able to see the promise the future holds for him. His dreams are simple: focus on recovery, give back to others facing challenges similar to those he faced, continue with his education, and pursue his passion of working with his hands to create things.

### C. Seriousness of the Offense, Respect for the Law and Just Punishment

Mr. DeHart does not disagree that the offenses he committed are very serious. However, his involvement with guns stopped over three years ago. In light of his conduct since these

incidents and the restrictions he has faced over the last two years on pretrial services, a sentence of time served together with two years of supervised release constitutes just punishment. Mr. DeHart has already spent a meaningful amount of time behind bars for his actions. Mr. DeHart takes the proposition of extended supervision very seriously. Over the last two years, he has been in close contact with his pretrial services officer. He is well aware that if he was he not to comply with any of the conditions imposed on him, he would find himself back before this Court, facing harsh consequences for betraying the Court's trust.

Given his outstanding progress and the growth he has exhibited in the years since his committing the underlying offenses, imposing a custodial sentence at this point would be not only counterproductive to the ultimate goal of reintegrating convicted felons back into the community and allowing them to succeed, but it would be a huge setback for Mr. DeHart. At a minimum, he would lose his housing and potentially his new job as well, making his economic future upon his release bleak. Further, the social isolation from being potentially hundreds of miles away from his support system, as well as other common stressors that come with incarceration could cause him to relapse again and disrupt the immense progress he has made in his life and sobriety. In contrast, allowing Mr. DeHart to continue on the path he is on will benefit him mentally, emotionally, physically and financially, and better serve the goals of sentencing.

## VI. CONCLUSION

Mr. DeHart recognizes that the offenses he committed warrant a serious penalty. Through his conduct in the years since these offenses were committed, Mr. DeHart has demonstrated that he does not need a custodial sentence to impress upon him the wrongness of his actions or prepare him to reenter society as a law-abiding citizen. He asks this Court to impose a sentence of time actually served and two years of supervised release.

Dated: September 23, 2024                        /s/
                                                               JAY RORTY
                                                               Attorney for Defendant Mark DeHart